**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GEVORG HOVHANNISYAN,<br><br>Plaintiff,<br><br>vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION LLC, SANTANDER CONSUMER USA INC. d/b/a CHRYSLER CAPITAL<br><br>Defendants. | Civil Case No.: 1:26-cv-04987<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Gevorg Hovhannisyan ("Plaintiff"), by and through the undersigned counsel, brings this action on an individual basis, against Experian Information Solutions, Inc. ("Experian"); Trans Union LLC ("Trans Union") (collectively, the "Credit Bureau Defendants"); and Santander Consumer USA Inc. d/b/a Chrysler Capital ("Chrysler"); (all defendants collectively, "Defendants"), and states as follows:

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

8. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items

of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11. Plaintiff's claims arise out of the Credit Bureau Defendants' patently contradictory and materially misleading reporting concerning Plaintiff's Chrysler Capital account. Although the account-level disclosures reported that the account was paid or paying as agreed, carried a $0 balance, had no past-due amount, and had no reported delinquency, the same reporting systems classified the account as negative or adverse and generated statements that Plaintiff had a serious delinquency of 60 days or greater or a derogatory indicator.

12. Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and for failing to conduct a reasonable reinvestigation, record the current status of the disputed information, and delete or modify information whose accuracy and completeness they failed to verify, in violation of the FCRA, 15 U.S.C. § 1681i, including 15 U.S.C. § 1681i(a)(5)(A).

13. Plaintiff also brings a claim against Defendant Chrysler for failing, after receiving notice of Plaintiff's disputes from each Credit Bureau Defendant, to fully and properly investigate the disputes, review all relevant information, and modify, delete, or permanently block the inaccurate, incomplete, and unverified information, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1), including but not limited to 15 U.S.C. § 1681s-2(b)(1)(E).

14. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

15. Gevorg Hovhannisyan ("Plaintiff") is a natural person residing in Brooklyn, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16. Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a consumer reporting agency that maintains its principal place of business at 475 Anton Boulevard, Costa Mesa, CA 92626.

17. Defendant Trans Union LLC ("Defendant Trans Union" or "Trans Union is a consumer reporting agency that maintains its principal place of business at 555 West Adams Street, Chicago, IL 60661.

18. Defendant Santander Consumer USA Inc. d/b/a Chrysler Capital ("Chrysler") is a national bank with its headquarters at 1601 Elm Street, Suite 800, Dallas, TX 75201 and is authorized to do business in the State of Florida, including within this District.

19. Chrysler is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

20. Jurisdiction of this Court arises under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p .

21. Venue is proper in this District under 28 U.S.C. § 1391(b).

## FACTS

### Plaintiff's Chrysler Capital Account Was Paid in Full Without Delinquency

22. On June 28, 2019, Plaintiff purchased a vehicle that was financed through Chrysler Capital in the amount of $18,159.00. Under the financing agreement, Plaintiff was required to make monthly payments of $504.43, with each payment due on the 30th day of the month. Plaintiff consistently made timely payments on the account and was never delinquent.

23. On August 19, 2022, Plaintiff made a $504.43 payment toward the account, covering his August 2022 payment obligation. Four days later, on August 23, 2022, the vehicle was totaled. Plaintiff thereafter submitted a claim to Travelers Insurance under Claim No. INQ5870-002 for the total loss of the vehicle.

24. While the insurance claim was pending, Plaintiff made another payment of $504.43 on August 28, 2022, intended to cover his next monthly payment. Although that payment was subsequently reversed on September 12, 2022, the reversal did not create a reportable delinquency because the account was fully satisfied before the next scheduled payment due date.

25. Specifically, Chrysler's transaction history reflects that, on September 21, 2022, Chrysler received and applied a $26,999.82 insurance payment from Travelers, a $495.00 payment, and Plaintiff's $504.43 payment effective as of August 19, 2022.

26. Chrysler's own account records therefore confirmed that the insurance proceeds and Plaintiff's payments fully satisfied the account on September 21, 2022, leaving a $0.00 balance.

27. Thus, the Chrysler Capital account was paid in full and had a zero balance nine days before Plaintiff's next scheduled payment due date of September 30, 2022.

28. Plaintiff had no unpaid balance that remained outstanding for 30 days, much less 60 days. No scheduled payment was ever reported as 30 days late, no scheduled payment was ever reported as 60 days late, and Plaintiff was never delinquent on the Chrysler Capital account.

29. Chrysler's knowledge of the total loss is independently confirmed by the very notation it furnished: "early termination/insurance loss." Chrysler therefore knew both why the account ended early and that the account had been satisfied through insurance, rather than terminated because Plaintiff failed to pay.

30. Accordingly, any coding that converted the total-loss notation into an adverse, negative, delinquent, or derogatory classification was patently false and materially misleading because it conveyed delinquencies or credit nonperformances that never occurred.

**Defendants Report Plaintiff as Having a Serious Delinquency on the Chrysler Capital Account**

31. In or around 2023 or 2024, Plaintiff discovered that his Chrysler Capital account was being associated with derogatory information on his credit reports, even though the account-level payment history did not identify any late payment.

32. Plaintiff was surprised and concerned because the account had been paid in full, the balance was $0, and the account had never been delinquent.

33. Plaintiff attempted to resolve the issue on his own and contacted Experian, Trans Union, and Chrysler on multiple occasions over the following years in an effort to have the inaccurate derogatory information corrected. Despite Plaintiff's repeated efforts, the issue remained unresolved.

34. The inaccurate reporting adversely affected Plaintiff's credit profile and ability to obtain credit, including his efforts to refinance a mortgage and secure other financing.

35. On May 27, 2026, Plaintiff obtained a tri-merged MyFICO report containing bureau-specific information from Equifax, Trans Union, and Experian. The report identified only one "Negative Account": Plaintiff's Chrysler Capital account ending in 6533, as demonstrated below.


NEGATIVE ITEMS

Negative Accounts

Chrysler Capital
Cre
Equifax, TransUnion,
Experian

36. The account-level disclosure reported the Chrysler account as "Pays account as agreed," "Paid or paying as agreed," or "Account paid satisfactorily," depending on the bureau; reported a $0 balance; identified the worst delinquency as "None Reported"; and displayed no 30-day, 60-day, or other late payment.

37. The Chrysler account nevertheless carried comments including "Early termination/insurance loss," "Lease-early termination," and "Early Termination/Insurance Loss," and MyFICO classified that exact account as negative. The reporting thus treated an involuntary total loss and full insurance payoff as adverse and delinquent credit behavior.

38. At the same time, the MyFICO score-factor disclosures attributed to Trans Union and Experian the statement: "You have a serious delinquency (60 days past due or greater) or derogatory indicator on your credit report." Certain Trans Union score factors further stated that Plaintiff had recently missed a payment or had a derogatory indicator, notwithstanding that the account had been paid in full in September 2022 without any late payment.

39. The report contained no collections or public records and identified no other negative account. The Chrysler account was therefore the only account affirmatively identified by the report as the source of negative treatment.

40. The July 25, 2026 MyFICO report repeated the same contradiction after the disputes: it again identified Chrysler as the negative account, reported no delinquency in the account details, and attributed the serious-delinquency or derogatory-indicator factor to Trans Union and Experian.

41. On July 28, 2026, Trans Union's own direct file disclosure removed any doubt about the source of its derogatory treatment. Trans Union expressly listed Chrysler account ending in 6533 under "Accounts with Adverse Information," while separately listing Plaintiff's other

Chrysler accounts under "Satisfactory Accounts."

42. This was not merely a dispute about the numerical effect of accurate data on a proprietary score. The account itself was affirmatively categorized as negative and adverse. A report that simultaneously represents that the same account was paid as agreed, had no delinquency, and was adverse is facially contradictory, patently false, and materially misleading to any creditor evaluating Plaintiff's willingness and ability to pay.

**Plaintiff's First Dispute to Defendants Regarding the Inaccurate Credit Reporting**

43. On or about June 15, 2026, Plaintiff sent detailed written disputes by certified mail to each Credit Bureau Defendant concerning the derogatory information associated with Chrysler Capital account ending in 6533.

44. Plaintiff explained that the visible tradeline did not show any delinquency, but that the score-factor disclosure identified a serious delinquency and that the Chrysler account was the only account identified as negative. Plaintiff explained why no late payment ever occurred and enclosed Chrysler's transaction history and the Travelers total-loss letter.

45. Plaintiff requested that Experian and Trans Union reinvestigate the accuracy and completeness of the disputed information, remove every late-payment or derogatory status, report the account as "Paid, Closed/Never late," and provide him with corrected disclosures.

46. The certified-mail item to Experian was delivered on or about June 20, 2026, and Experian acknowledged the dispute on June 26, 2026. The certified-mail item to Trans Union was delivered on or about June 23, 2026, and Trans Union acknowledged the dispute on June 25, 2026.

47. The disputes gave each Credit Bureau Defendant actual notice of the precise contradiction, patent falsity, and misleading nature of the subject reporting, and supplied documents sufficient to verify that no late payment occurred.

**Defendant Experian's Unreasonable Dispute Reinvestigation**

48. Upon information and belief, Experian sent Defendant Chrysler an automated consumer dispute verification ("ACDV") that conveyed Plaintiff's June 2026 dispute and all relevant information regarding it.

49. Experian acknowledged Plaintiff's dispute on June 26, 2026 and thereafter represented on July 14, 2026 and July 20, 2026 that the reporting had been updated.

50. However, the July 25, 2026 MyFICO report continued to identify the Chrysler account as Plaintiff's negative account and continued to attribute to Experian the serious-delinquency or derogatory-indicator score factor.

51. Experian's continued reporting was irreconcilable with its own account-level fields and the documentation Plaintiff provided. Experian failed to adequately review the payment history, total-loss documentation, insurance payoff, zero balance, and absence of any reported delinquency.

52. Experian failed to conduct a reasonable reinvestigation of Plaintiff's June 2026 dispute and failed to verify the accuracy and completeness of the adverse classification or derogatory indicator.

53. Because Experian could not verify that an account reported as paid satisfactorily with no delinquency was properly classified as negative or derogatory, Experian was required to correct, delete, or modify that disputed information. Experian nevertheless continued reporting it, in violation of 15 U.S.C. § 1681i(a)(5)(A).

54. Specifically, Experian failed to verify the accuracy and completeness of the disputed reporting or establish that Plaintiff's dispute was unfounded. Plaintiff disputed that the Chrysler account was being falsely classified as derogatory because he had never been delinquent

thereon, had made the August 2022 payment before it became due, and the insurance proceeds paid the account in full on September 21, 2022, before the next payment became due. Thus, no payment was ever 30 or 60 days past due. Nevertheless, Trans Union continued to classify the account as adverse and associate Plaintiff's credit file with a serious-delinquency or derogatory indicator.

55. Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered in June 2026, determine whether the disputed information was inaccurate, and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

56. Upon information and belief, Trans Union sent Defendant Chrysler an automated consumer dispute verification ("ACDV") that conveyed Plaintiff's June 2026 dispute and all relevant information regarding it.

57. Trans Union acknowledged Plaintiff's dispute on June 25, 2026, but did not provide Plaintiff with a substantive reinvestigation result.

58. The July 25, 2026 MyFICO report continued to identify the Chrysler account as negative and continued to attribute the serious-delinquency or derogatory-indicator factor to Trans Union. On July 28, 2026, Trans Union's own direct disclosure expressly placed the exact Chrysler account ending in 6533 under "Accounts with Adverse Information."

59. Trans Union simultaneously placed Plaintiff's other Chrysler accounts under "Satisfactory Accounts." Its direct disclosure therefore affirmatively tied the adverse treatment to account ending in 6533, even though the account had a $0 balance, had been paid as agreed, and contained no reported delinquency.

60. Trans Union failed to adequately review the payment history, total-loss

documentation, insurance payoff, zero balance, and absence of any reported delinquency, and failed to verify the accuracy and completeness of the adverse classification or derogatory indicator.

61. Because Trans Union could not verify that an account reported as paid as agreed with no delinquency was properly classified as adverse or derogatory, Trans Union was required to delete or modify that disputed information. Trans Union nevertheless continued reporting it, in violation of 15 U.S.C. § 1681i(a)(1)(A) and 15 U.S.C. § 1681i(a)(5)(A).

62. Specifically, Trans Union failed to verify the accuracy and completeness of the disputed reporting or establish that Plaintiff's dispute was unfounded. Plaintiff disputed that the Chrysler account was being falsely classified as derogatory because he had never been delinquent thereon, had made the August 2022 payment before it became due, and the insurance proceeds paid the account in full on September 21, 2022, before the next payment became due. Thus, no payment was ever 30 or 60 days past due. Nevertheless, Trans Union continued to classify the account as adverse and associate Plaintiff's credit file with a serious-delinquency or derogatory indicator.

63. Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered in June 2026, determine whether the disputed information was inaccurate, and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendants' Method for Considering Consumer Credit Report Disputes**

64. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

65. The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to

respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

66. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

67. It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

68. Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

69. Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

70. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

71. These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

72. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

73. The data furnishers, like Defendant Chrysler, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See

15 U.S.C. § 1681s-2(b).

74. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant Chrysler's Unreasonable Dispute Reinvestigation**

75. Upon information and belief, Chrysler received Experian's ACDV concerning Plaintiff's June 2026 dispute and was thereby notified that Plaintiff disputed the serious-delinquency or derogatory classification associated with account ending in 6533.

76. Upon information and belief, Chrysler also received Trans Union's ACDV concerning Plaintiff's June 2026 dispute and was thereby notified of the same specific inaccuracy.

77. The ACDVs notified Chrysler that the bureaus were treating the account as serious, delinquent, negative, adverse, or otherwise derogatory even though the visible payment history did not identify any late payment.

78. Chrysler possessed the complete payment and servicing records needed to resolve the disputes. Those records showed Plaintiff's payments, the September 21, 2022 insurance proceeds, the full satisfaction of the account, and the resulting $0 balance.

79. Chrysler knew that the vehicle had been totaled because it received and applied the insurer's $26,999.82 payoff and furnished the "early termination/insurance loss" notation that caused or contributed to the adverse classification.

80. Chrysler also knew that Plaintiff had never been late. Its records showed that the account was fully satisfied on September 21, 2022, before the September 30, 2022 due date, and contained no 30-day or 60-day delinquency. Chrysler knew that Plaintiff was at no point 30 or

more days delinquent on a payment obligation.

81. Any reasonable investigation of Chrysler's own records would therefore have established that treating the involuntary insurance loss and payoff as adverse credit behavior was inaccurate and materially misleading.

82. Chrysler would not even have needed to look beyond the supporting documents Plaintiff submitted with his disputes. Those documents directly confirmed that the vehicle was declared a total loss, that the insurer paid the account in full, and that the balance was reduced to $0, corroborating Chrysler's own account and payment records.

83. Nevertheless, upon information and belief, Chrysler verified the disputed information, failed to communicate that the account had never been delinquent, or otherwise failed to correct the coding that caused the account to be treated as derogatory.

84. Upon information and belief, Chrysler thereafter continued furnishing information that caused Experian and Trans Union to maintain the account as negative, adverse, or subject to a derogatory indicator.

85. Defendant Chrysler violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to conduct a reasonable investigation and review all relevant information, and violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to modify, delete, or permanently block the disputed information after its investigation revealed, or should have revealed, that the adverse reporting was inaccurate or incomplete.

**Plaintiff's Damages**

86. After Chrysler received the ACDVs, Plaintiff reasonably believes that Chrysler continued to furnish data that caused the national credit bureaus to treat the Chrysler account as delinquent, negative, adverse, or otherwise subject to a derogatory indicator.

87. Experian and Trans Union continued publishing the derogatory treatment after receiving Plaintiff's disputes. The July 25, 2026 MyFICO report continued to identify the Chrysler account as negative and continued to apply the serious-delinquency or derogatory-indicator factor to Experian and Trans Union.

88. Trans Union's July 28, 2026 direct disclosure continued to place account ending in 6533 under "Accounts with Adverse Information," establishing that the contradictory reporting remained in Plaintiff's Trans Union file after the dispute and was available for publication to prospective creditors.

89. On July 28, 2026, after the Credit Bureau Defendants had received and processed Plaintiff's disputes, Citi declined Plaintiff's application for a personal loan and Capital One advised Plaintiff that it had no credit offer for him. Upon information and belief, one or both Credit Bureau Defendants furnished consumer-report information or credit scores used in those decisions while the adverse Chrysler coding remained in Plaintiff's files.

90. Also on July 28, 2026, Goldman Sachs informed Plaintiff that it had obtained his credit score from Trans Union in connection with his Apple Card application. The notice confirms that Trans Union published consumer-report information and a credit score for an actual credit decision after Plaintiff's dispute.

91. Trans Union's file also reflects inquiries by MB Financial Services and 700Cr/Mercedes Benz on May 19, 2026. In connection with the resulting Mercedes lease, Plaintiff was informed that he did not qualify for Tier 1 credit and instead qualified for Tier 2. His monthly payment increased to approximately $1,013, rather than the approximately $800 payment he expected with the better credit tier, causing increased financing costs traceable to the Trans Union credit decision.

92. Plaintiff also attempted to refinance his mortgage and was informed by Rocket Mortgage that his credit score was too low for the requested refinancing. Although that attempt preceded the June 2026 disputes, it was part of the harm caused by the Credit Bureau Defendants' original inaccurate reporting and Chrysler's furnishing.

93. Plaintiff was also constructing a home for himself and his family. He sought personal loans and credit to purchase materials and meet construction expenses, but experienced denials and an inability to obtain the financing he required. The resulting lack of financing delayed the construction project and caused additional financial strain.

94. Plaintiff also incurred out-of-pocket expenses and devoted substantial time and effort to identifying and correcting the inaccurate information. He communicated with creditors and credit reporting agencies, submitted disputes, obtained and reviewed credit reports and account records, and documented adverse credit decisions.

95. Plaintiff is the primary income provider for his household, supports his spouse and parents, and bears significant household and construction-related obligations. The inability to obtain reasonably available financing placed additional financial pressure on Plaintiff and his family.

96. The continued derogatory reporting and repeated credit difficulties caused Plaintiff significant stress, frustration, anxiety, and ongoing concern about his ability to obtain credit, refinance existing obligations, complete his home construction, and meet his family's financial needs.

97. Plaintiff is also a licensed private detective who performs investigative work for insurance companies. Prospective employers and insurance companies review his credit information in connection with opportunities, and Plaintiff believes that the derogatory

information adversely affected certain opportunities and caused additional reputational concern and distress.

98. The timing and source evidence connect Plaintiff's injuries to Defendants' conduct: Trans Union was used for the Mercedes credit decision; Goldman Sachs confirmed a post-dispute Trans Union publication; Citi and Capital One denied credit while the disputed coding remained (both of whom, upon information and belief retrieved information from Experian); and Chrysler's continued furnishing after the ACDVs necessarily caused and contributed to the Credit Bureau Defendants' continued adverse treatment of the account.

99. At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

100. At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

101. As a standard practice, do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

102. Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendants' FCRA violations are willful.

103. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(Against Defendants Experian, and Trans Union)**

104. Plaintiff repeats and realleges the foregoing allegations as if set forth in full herein.

105. Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintained concerning Plaintiff. Defendants' reporting was patently contradictory and materially misleading because it classified the Chrysler account as negative or adverse and generated a serious-delinquency or derogatory-indicator factor while simultaneously reporting the account as paid as agreed, with a $0 balance, no past-due amount, and no delinquency.

106. Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

107. Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Against Defendants Experian, and Trans Union)**

108. Plaintiff repeats and realleges the foregoing allegations as if set forth in full herein.

109. Defendants violated 15 U.S.C. § 1681i by failing to conduct reasonable reinvestigations after Plaintiff notified them that the adverse or derogatory treatment of his Chrysler account contradicted the account's accurate payment history, $0 balance, paid-as-agreed status, and absence of any delinquency.

110. Defendants further violated 15 U.S.C. § 1681i(a)(5)(A) because they failed to verify the accuracy and completeness of the adverse or derogatory classification, yet failed to delete or modify the disputed information and continued reporting it regardless.

111. Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

112. Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681s-2(b)**
**Failure to Conduct an Investigation and Correct the Reporting**
**(Against Defendant Chrysler)**

113. Plaintiff repeats and realleges the foregoing allegations as if set forth in full herein.

114. Defendant Chrysler furnished information concerning Plaintiff's account to the national credit bureaus, including Experian and Trans Union, that caused the fully paid, never-late account to be classified as negative, adverse, or otherwise derogatory.

115. After receiving ACDVs from Experian and Trans Union, Defendant Chrysler violated 15 U.S.C. § 1681s-2(b) by failing to conduct a full and proper investigation, failing to review all relevant information, failing to report the results accurately, and failing to correct its records to prevent continued furnishing of the inaccurate or materially misleading information. Defendant Chrysler further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to modify, delete, or permanently block the disputed information after determining, or after a reasonable investigation should have determined, that it was inaccurate or incomplete.

116. As a result of Defendant Chrysler's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

117. Defendant Chrysler's conduct, action, and inaction were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

118. Plaintiff is entitled to recover attorneys' fees and costs from Defendant Chrysler in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter a judgment awarding Plaintiff actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs, and awarding Plaintiff such other and further relief as the Court may deem appropriate and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: New York,
August 14, 2026

By:*/s/ Meir Rubinov*
Meir Rubinov, NY Bar # 6077887
CONSUMER ATTORNEYS
68-29 Main Street
Flushing NY 11367
T: 718-640-8123
F: (718) 247-8020
E: mrubinov@consumerattorneys.com

*Attorneys for Plaintiff,*
*Gevorg Hovhannisyan*